

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00285-CV

MARY CUMMINS                                                          APPELLANT

V.

BAT WORLD SANCTUARY AND                                               APPELLEES
AMANDA LOLLAR

------------

FROM THE 352ND DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 352-248169-10

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellee Amanda Lollar and Appellee Bat World Sanctuary (BWS), a corporation operating as a nonprofit of which Lollar is president, sued Appellant Mary Cummins for defamation and breach of contract. After a bench trial at

---

[1]*See* Tex. R. App. P. 47.4.

which Cummins represented herself and for which Lollar and BWS had pro bono representation, the trial court signed a judgment in favor of Lollar and BWS. The trial court awarded BWS $10,000 in breach of contract damages and $176,700 in attorney's fees, and it awarded Lollar $3 million in actual damages for defamation and $3 million in exemplary damages. It further ordered that "Cummins be permanently enjoined and she is ORDERED to immediately and permanently remove from the internet" certain statements that she had made.[2]

In ten issues, Cummins, pro se, challenges the judgment on both the breach of contract and the defamation claims. Because we hold that Lollar produced legally sufficient evidence to support the trial court's finding that Cummins published with actual malice statements that were defamatory per se, that Cummins did not challenge the sufficiency of the evidence to support noneconomic damages, that Cummins did not preserve her challenge to the exemplary damages award and did not adequately challenge the award on appeal, we affirm the trial court's judgment in part. Because we conclude that BWS did not produce sufficient evidence on the breach of contract claim and that the award of attorney's fees therefore cannot stand, we reverse the judgment in part.

---

[2]This court received two friend of the court briefs in this case—one on behalf of Public Citizen and one filed jointly by The Cambodia Wildlife Sanctuary and ElephantsinCrisis.org.

## II. Background

Lollar became interested in the care of bats in 1989, after she found and sought treatment for an injured bat. She began rescuing injured bats, and she and a local veterinarian worked together to learn how to treat bats for various injuries and ailments. In 1994, Lollar liquidated her furniture business to create BWS. She bought a building in Mineral Wells, Texas in order to protect a wild bat colony that lived in the top of the building. The wild colony is still housed in the building, and BWS also has a captive colony of fruit bats and a captive colony of insectivorous bats. It also operates a rehabilitation center to treat injured bats for re-release.

In 2000, BWS began offering internships for people to come to BWS to learn about bat rehabilitation. Cummins visited BWS as an intern in 2010 but left early before completing the internship. To participate in the program, Cummins signed an internship contract.

In July 2010, shortly after leaving the internship and returning to her home in California, Cummins emailed someone at the United States Department of Agriculture to ask whether BWS had a USDA permit to operate. She alleged that "conditions [at BWS] were less than optimal" in that the smell of bat guano was noticeable outside the building housing the wild colony, that the wild colony included rabid bats, that Lollar did not quarantine sick bats from the wild colony before taking them in with the indoor colony for treatment, with the result that the indoor colony had mites, and that Lollar had failed to notice when a bat fell into a

3

trash can. Cummins also posted online videos that she had shot while at BWS, photographs she had taken there, and statements asserting that Lollar neglected her pet dogs.

In September 2010, Lollar and BWS sued Cummins for defamation and for breach of the intern contract. In March 2011, the trial court held a hearing on a plea to the jurisdiction filed by Cummins (which the trial court later denied). After that, in the same month, Cummins escalated her complaints to government agencies, reporting Lollar for illegal possession and use of controlled substances and for animal cruelty. Cummins made reports to the Texas Parks and Wildlife Department, the federal Department of Justice, the Texas Veterinary Board, the City of Mineral Wells, the Texas State Department of Health, the United States Fish and Wildlife Service, the Mineral Wells Health Department, and the Texas Attorney General. She made allegations to the IRS that Lollar was committing fraud. And Cummins also posted derogatory comments on AnimalAdvocates.us, a website she ran, on Twitter, and on her Facebook page. The comments accused Lollar of donor fraud, tax fraud, animal cruelty, practicing veterinary medicine without a license, and illegal possession of controlled substances.

Cummins made a number of other statements on the internet that were critical of Lollar but did not accuse her of any crime. For example, Lollar obtained her GED when she was fifteen years old and spent years learning about the care of bats under the supervision of a veterinarian. Cummins's internet comments, however, portrayed Lollar as someone too uneducated and

4

unintelligent to be considered an expert on wildlife rehabilitation. Cummins repeatedly made statements to the effect that Lollar "has not gone past the ninth grade," "admits she has no education, didn't even finish high school, is not a veterinarian, has never taken any classes in animal care," and "admits she is uneducated yet she performs surgery on bats [that] die." Cummins speculated about Lollar's reasons for not finishing high school, stating that "I'm going to wager that she had poor grades. Good students don't drop out so they can become a fork lift operator, welder and a maid.[3] Oops, I mean a cleaning service." Cummins mentioned in only one of her numerous postings on the topic that Lollar had earned her GED.

Cummins also posted negative statements about Lollar's attorney (accusing him of being unethical), a court reporter present at a deposition (accusing him of perjury and corruption), and the trial judge (accusing him of ruling for Lollar as a favor to Lollar's attorney). After her own attorney failed to corroborate one of her accusations against Lollar's attorney, she accused him of falling asleep during the deposition and called the Tarrant County Bar Association to question his competence, prompting him to withdraw from representing her.

Lollar amended her petition to include the statements that Cummins had posted about her after the suit was filed. Lollar alleged that Cummins's acts

---

[3]These are all jobs that Lollar had held before founding BWS.

5

constituted common law defamation as well as libel under section 73.001 of the civil practice and remedies code.[4]

After a four-day trial to the bench, the trial court rendered judgment for Lollar and BWS on the defamation and breach of contract claims, and Cummins now appeals.

### III. Standards of Review

*Legal Sufficiency*

In each of her issues, Cummins challenges the sufficiency of the evidence to support the judgment. A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions and are reviewable for legal and factual sufficiency of the evidence to support them by the same standards.[5] We may review conclusions of law to determine their correctness based upon the facts, but we will not reverse because of an erroneous conclusion if the trial court rendered the proper judgment.[6]

A party will prevail on its legal-sufficiency challenge of the evidence supporting an adverse finding on an issue for which the opposing party bears the

---

[4]*See* Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (West 2011).

[5]*Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see also MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009).

[6]*City of Austin v. Whittington*, 384 S.W.3d 766, 779 n.10 (Tex. 2012) (citing *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002)); *H.E.B., L.L.C. v. Ardinger*, 369 S.W.3d 496, 513 (Tex. App.—Fort Worth 2012, no pet.).

burden of proof if there is a complete absence of evidence of a vital fact or if the evidence offered to prove a vital fact is no more than a scintilla.[7]  More than a scintilla exists when the evidence as a whole rises to a level enabling reasonable and fair-minded people to have different conclusions.[8]  We regard evidence that creates a mere surmise or suspicion of a vital fact as, in legal effect, no evidence.[9]

In conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the judgment, crediting evidence that a reasonable fact finder could have considered favorable and disregarding unfavorable evidence unless the reasonable fact finder could not.[10]  We indulge every reasonable inference that supports the trial court's findings.[11]  If a party is attacking the legal sufficiency of an adverse finding on an issue on which the party had the burden of proof, and there is no evidence to support the finding, we review all the

---

[7]*Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex. 2014).

[8]*Id.*

[9]*Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014).

[10]*Waste Mgmt.*, 434 S.W.3d at 156.

[11]*Id.*

evidence to determine whether the contrary proposition is established as a matter of law.[12]

*Actual Malice*

In a defamation case in which actual malice is required and is found, the First Amendment requires appellate courts to conduct an independent review of the evidence supporting the finding.[13] The Texas Supreme Court has described the review we must conduct and the deference we must give to factfinder's determinations of credibility.

> The independent review required by the First Amendment is unlike the evidentiary review to which appellate courts are accustomed in that the deference to be given the fact finder's determinations is limited. Indeed, the [United States] Supreme Court has stated that "[t]he question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." On questions of law we ordinarily do not defer to a lower court at all. But the sufficiency of disputed evidence to support a finding cannot be treated as a pure question of law when there are issues of credibility.
>
> . . . .
>
> . . . . [A]n independent review of evidence of actual malice should begin with a determination of what evidence the jury must have found incredible. . . . As long as the jury's credibility determinations are reasonable, that evidence is to be ignored. Next, undisputed facts should be identified. . . . Finally, a determination must be made whether the undisputed evidence along with any

---

[12] *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989).

[13] *Bentley v. Bunton*, 94 S.W.3d 561, 597 (Tex. 2002).

other evidence that the jury could have believed provides clear and convincing proof of actual malice.[14]

## IV. Discussion

## A. Defamation

Cummins's first five issues challenge the award of damages for defamation. Her issues are:

1. Are Appellees Amanda Lollar, BWS, limited-purpose public figures with respect to their voluntary and public participation in animal and bat care?

2. Are statements about Appellees, public safety, public health, government action, statements about matters of public concern?

3. Did Appellees present "more than a scintilla" of evidence that any of the supposed defamatory statements meets *all four* of the following criteria?

    a. is a verifiable statement of fact;

    b. is false or not substantially true;

    c. is of and concerning Appellees; and

    d. is capable of conveying a defamatory meaning about Appellees?

4. Did the trial court err in granting [Lollar and BWS] judg[]ment against Appellant for defamation?

5. Were Appellees entitled to the amount of compensatory or exemplary damages awarded?

We first address Cummins's arguments regarding BWS's entitlement to judgment for defamation.[15] The record does not disclose when in 2010 BWS

---

[14]*Id.* at 597–99.

9

incorporated, but before incorporating, BWS was a nonprofit association. Thus, at all times relevant to this suit, BWS was an entity distinct from Lollar.[16] Although the petition alleged that Cummins made false, defamatory statements about both Lollar and BWS, BWS did not ask for damages for defamation.[17] And the trial court awarded BWS only the breach of contract damages it had asked for. Accordingly, because there is no judgment for BWS for defamation, we do not address Cummins's arguments about the sufficiency of the evidence to support the judgment for defamation as to BWS.

### 1. Law of Defamation in Texas

To prevail on a defamation claim, a plaintiff must prove that the defendant published a statement that was defamatory concerning the plaintiff and, generally, that the defendant did so with some degree of fault regarding the truth of the statement—with actual malice if the plaintiff is a public official or public figure or

---

[15] *See Waste Mgmt.*, 434 S.W.3d at 150 n.35 (noting that a corporation may sue for defamation but a business may not; the owner of a business may sue for defamation and a business may sue for business disparagement).

[16] *See* Tex. Bus. Org. Code Ann. § 252.006(a) (West 2012) ("A nonprofit association is a legal entity separate from its members for the purposes of determining and enforcing rights, duties, and liabilities in contract and tort."); *Daniels v. Empty Eye, Inc.*, 368 S.W.3d 743, 752 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (observing that a corporation and its president are distinct entities).

[17] *See Waste Mgmt.*, 434 S.W.3d at 150 n.35. *See Burbage*, 447 S.W.3d at 261 n.6, for a discussion of the differences between a claim for defamation and one for business disparagement.

with negligence if the plaintiff is a private individual.[18]  In some cases, the plaintiff must also prove that the statements were false.[19]

"A statement is defamatory when a person of ordinary intelligence would interpret it in a way that tends to injure the subject's reputation and thereby expose the subject to public hatred, contempt, or ridicule, or financial injury, or to impeach the subject's honesty, integrity[,] virtue, or reputation."[20]  A defamatory statement may be classified as either defamatory per se or defamatory per quod. A statement is defamatory per se if it is injurious to a person's office, business, profession, or occupation or if it falsely charges a person with the commission of a crime.[21]  A statement is defamatory per se if it is defamatory on its face, that is, if it is "so obviously hurtful to the person aggrieved" that the law requires no proof of its injurious character to make it actionable.[22]  Statements are defamatory per

---

[18]*In re Lipsky*, 411 S.W.3d 530, 543 (Tex. App.—Fort Worth 2013, orig. proceeding).

[19]*See, e.g.*, *Hearst Corp. v. Skeen*, 159 S.W.3d 633, 637 n.1 (Tex. 2005) ("Proving falsity in a public-figure defamation case is the plaintiff's burden of proof.").

[20]*Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 728 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (citing *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114–15 (Tex. 2000), and Tex. Civ. Prac. & Rem Code. Ann. § 73.001.

[21]*Morrill v. Cisek*, 226 S.W.3d 545, 549–50 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

[22]*Id.*

quod if they are not obviously hurtful and require the plaintiff to show their defamatory meanings through extrinsic evidence.[23]

Defamation law has evolved substantially since this country's founding.[24] Under the early common law of defamation, no degree of fault was required; a person was strictly liable for making defamatory statements.[25] And hostile criticism against the government was actionable even if the critical statements were true.[26] Over time, the law evolved to provide some privileges, such as the privilege of "fair comment."[27] Additionally, even in early cases in this country, the law allowed truth as a defense.[28]

---

[23]*Hotchkin v. Bucy*, No. 02-13-00173-CV, 2014 WL 7204496, at *4 (Tex. App.—Fort Worth Dec. 18, 2014, no. pet.) (mem. op.); *Meisel v. U.S. Bank, N.A.*, 396 S.W.3d 675, 680 (Tex. App.—Dallas 2013, no pet.).

[24]*Curtis Pub. Co. v. Butts*, 388 U.S. 130, 151, 87 S. Ct. 1975, 1989 (1967).

[25]*Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987); John E. Hallen, *Fair Comment*, 8 Tex. L. Rev. 41, 53 (1929); *see also* John J. Watkins & Charles W. Schwartz, *Gertz and the Common Law of Defamation: of Fault, Nonmedia Defendants, and Conditional Privileges*, 15 Tex. Tech. L. Rev. 823, 825 (1984).

[26]Hallen, *supra* note 25, at 53; *see also Curtis Pub.*, 388 U.S. at 151, 87 S. Ct. at 1989.

[27]*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13–14, 110 S. Ct. 2695, 2703 (1990) (observing that the privilege of "fair comment" was incorporated into the common law); *Cain v. Hearst Corp.*, 878 S.W.2d 577, 581 (Tex. 1994) (discussing various privileges); Hallen, *supra* note 25, at 41–42.

[28]*See Hallen*, *supra* note 25, at 53–54 (citing *Commonwealth v. Clap*, 4 Mass. 163, 169 (1808)); *see also Neely v. Wilson*, 418 S.W.3d 52, 62 (Tex. 2013, pet. denied) (noting that "[t]he common law and statutes provide certain defenses and privileges to defamation claims").

Significant changes to modern defamation law began with *New York Times v. Sullivan*, in which the United State Supreme Court held that, aside from whatever standards a state might use to determine a defendant's entitlement to defamation privileges under state law, the First Amendment imposes its own limits in defamation actions brought by public officials against those who have criticized their official conduct. [29] In those cases, the First Amendment's guarantees of free speech and of a free press prohibit strict liability for defamatory statements, and a plaintiff must prove that the statements were made with "actual malice."[30]

The term "malice" was already used in defamation law in negating the availability of privileges under state law, and in that context, malice referred to spite or ill-will.[31] But in the context of defining the constitutional privilege under which the plaintiff must prove fault, the Supreme Court used that term to mean the degree of knowledge the defendant had about the truth of that statement.[32] Specifically, the Court held that a defendant acts with actual malice if the defendant publishes the statement "with knowledge that it was false or with

---

[29]376 U.S. 254, 279, 283, 84 S. Ct. 710, 726–27 (1964).

[30]*Id.* at 280–81, 84 S. Ct. at 726.

[31] *See, e.g.*, *Holt v. Parsons*, 23 Tex. 9, 20 (1859) (stating that to be classified as a privileged communication, a statement must have been made free from malicious intent).

[32]*New York Times*, 376 U.S. at 279–80, 84 S. Ct. at 726.

13

reckless disregard of whether it was false or not."[33]  Because "'actual malice concerns the defendant's attitude toward the truth, not toward the plaintiff,'" a defendant's "free-floating" feeling of ill will toward a plaintiff is generally irrelevant to proving actual malice.[34]

In *Curtis Publishing Company*, a plurality of the Supreme Court held that the actual malice requirement applies to defamation actions brought by public figures.[35]  And in *Rosenbloom v. Metromedia, Inc.*, a plurality of the Court concluded that "[i]f a matter is a subject of public . . . interest, it cannot suddenly become less so merely because a private individual is involved," and therefore

---

[33]*Id.*; *Masson v. New Yorker Magazine*, 501 U.S. 496, 510–11, 111 S. Ct. 2419, 2429–30 (1991) (describing this standard as requiring proof that the author "entertained serious doubts as to the truth of his publication or acted with a 'high degree of awareness of . . . probable falsity'") (citations omitted); *see also* Watkins & Schwartz, *supra* note 25, at 870–71 (noting the difficulty courts have had with the interplay between the ill will malice standard used to defeat a state law privilege and the "constitutional malice standard" required under the First Amendment).

[34]*Freedom Newspapers of Tex. v. Cantu*, 168 S.W.3d 847, 858 (Tex. 2005) (quoting *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 165 (Tex. 2004) and stating that "[w]hile a personal vendetta demonstrated by a history of false allegations may provide some evidence of malice, free-floating ill will does not").

[35]388 U.S. at 164, 170, 172, 87 S. Ct. at 1996, 1999, 2000; *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S. Ct. 2997, 3008 (1974) (stating that people may be classed as public figures either "by reason of the notoriety of their achievements" or because of "the vigor and success with which they seek the public's attention").

the constitutional privilege applies to suits brought by private persons if the statements forming the basis of the suit were on a subject of public interest.[36]

Then, in *Gertz*, the Court backed off from *Rosenbloom*'s holding, concluding that a state's interest in compensating private plaintiffs for injury to reputation requires that a different rule apply to defamation claims they bring.[37] That Court did, however, reaffirm application of the *New York Times* privilege to public figures. In doing so, it acknowledged that a person may become a public figure in one of two ways: by achieving such pervasive fame or notoriety that they may be considered a public figure "for all purposes and in all contexts," and by injecting his or herself or being "drawn into a particular public controversy," "thereby becom[ing] a public figure for a limited range of issues."[38]

While the *Gertz* court held that the *New York Times* constitutional privilege is not available to media defendants in suits brought against them by private individuals, it also held that in such cases, *some* degree of fault must be proven—and thus, there can be no strict liability in defamation suits against

---

[36]403 U.S. 29, 43, 91 S. Ct. 1811, 1819 (1971), *abrogated by Gertz*, 418 U.S. 323, 94 S. Ct. 2997. Justice Marshall dissented, pointing out that the under that rule, "courts will be required to somehow pass on the legitimacy of interest in a particular event or subject." *Id.* at 79, 91 S. Ct. at 1837.

[37]418 U.S. at 343, 94 S. Ct. at 3008–09.

[38]*Id.* at 351, 94 S. Ct. at 3012–13.

media defendants.[39]  But the Court left it to the individual states to decide what degree of fault had to be proven.[40]

*Gertz* also addressed damage awards in such cases, holding that states may not permit recovery of presumed or punitive damages unless actual malice is proven.[41]  As for *Rosenbloom*'s public concern standard, the *Gertz* court stated that using that standard in a suit brought by a private person would force judges "to decide on an ad hoc basis which publications address issues of 'general or public interest' and which do not."[42]

In summary, after *Gertz*, a public figure suing a media defendant for defamation was required to show actual malice.  A private figure suing a media defendant was required to show at least negligence, but unless state law required it, the plaintiff did not have to show actual malice, even if the defamatory statements were on a matter of public concern.[43]  The private plaintiff would,

---

[39]*Id.* at 346–47, 94 S. Ct. at 3010.

[40]*Id.*; *Neely*, 418 S.W.3d at 61.

[41]*Gertz*, 418 U.S. at 349, 94 S. Ct. at 3011.

[42]*Id.* at 346, 94 S. Ct. at 3010.  In his dissent, Justice Brennan disagreed with the majority's failure to provide to the media the same level of constitutional protection when its "reports concern private persons' involvement in matters of public concern" as it did for reporting about public officials and figures.  *Id.* at 362, 94 S. Ct. at 3019 (Brennan, J., dissenting).

[43]*Id.* at 345–47, 94 S. Ct. at 3010.

however, have to show actual malice when suing a media defendant in order to recover either presumed or punitive damages.[44]

In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, the Court considered the First Amendment's application to defamation cases in which the plaintiff and defendant are both private persons and the speech involved is purely private speech—that is, speech that does not involve matters of public concern.[45] *Dun & Bradstreet* involved statements about Greenmoss Builders in a credit report sent by Dun & Bradstreet to five of its subscribers.[46]

In a plurality opinion, the Court discussed *Gertz* and characterized that opinion as holding that a plaintiff had to show actual malice to recover presumed and punitive damages if the plaintiff was a private individual who sued a media defendant "for a libel that involved a matter of public concern."[47] After discussing the competing interests involved, the plurality held that when defamation suits involve only private parties, "[i]n light of the reduced constitutional value of speech involving *no matters of public concern*," a state's interest in providing remedies for defamation "adequately supports awards of presumed and punitive

---

[44]*Id.* at 349, 94 S. Ct. at 3011.

[45]472 U.S. 749, 751, 105 S. Ct. 2939, 2941 (1985).

[46]*Id.* at 751, 105 S. Ct. at 2941.

[47]*Id.*

damages—even absent a showing of 'actual malice.'"[48]  Thus, a private plaintiff suing a media defendant had to prove actual malice to recover presumed or punitive damages, regardless of the subject matter of the statements, but a private plaintiff suing a private defendant did not have to prove actual malice to recover presumed or punitive damages if the speech was on a matter of private concern.  The opinion did not set out a standard for recovering such damages in suits when the plaintiff and defendant are private individuals and the speech is on a matter of public concern.

In *Philadelphia Newspapers, Inc. v. Hepps*, the Court once again brought up the "public concern" standard.[49]  The Court considered *New York Times* and its progeny and stated that from those cases, one could discern "two forces that may reshape the common-law landscape to conform to the First Amendment. The first is whether the plaintiff is a public official or figure, or is instead a private figure.  The second is whether the speech at issue is of public concern."[50]

With these two forces in mind, the *Hepps* Court added another limitation on the common law of defamation, this time addressing the common law presumption that defamatory speech is false.[51]  The Court held that "when a

---

[48] *Id.* at 761, 105 S. Ct. at 2946 (emphasis added).

[49] 475 U.S. 767, 106 S. Ct. 1558–59 (1986).

[50] *Id.* at 775, 106 S. Ct. at 1563.

[51] *Id.* at 768–69, 106 S. Ct. at 1559.

plaintiff seeks damages against *a media defendant* for *speech of public concern*,"
it is not enough to satisfy the First Amendment for a state to allow the defense of
truth; instead, the plaintiff must bear the burden of proving the statements were
false.[52] *Hepps* involved a media defendant, and the Court expressly declined to
state whether the rule it set out applied equally to nonmedia defendants.[53] This
question of in what circumstances, if any, a private figure plaintiff suing a
nonmedia defendant has the burden of proving that a defamatory statement is
false has not been answered by the Supreme Court.

In Texas, with respect to the level of fault that must be proven in
defamation actions, we require a plaintiff who is a public official or figure to show
actual malice, regardless of whether the defendant is a member of the media or a
private individual.[54] When the plaintiff is a private figure suing a media defendant,

---

[52]*Id.* at 777, 106 S. Ct. at 1564 (emphasis added).

[53]*Id.* at 779 n.4, 106 S. Ct. at 1565. In his concurring opinion, Justice
Brennan complained that "such a distinction is irreconcilable with the
fundamental First Amendment principle that [t]he inherent worth of . . . speech in
terms of its capacity for informing the public does not depend upon the identity of
the source, whether corporation, association, union, or individual." *Id.* at 780,
106 S. Ct. at 1565 (Brennan, J., concurring) (citations and internal quotation
marks omitted); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S.
289, 309 n.16, 99 S. Ct. 2301, 2314 (1979) ("We have not adjudicated the role of
the First Amendment in suits by private parties against nonmedia defendants.").

[54]*Neely*, 418 S.W.3d at 61; *Casso v. Brand*, 776 S.W.2d 551, 554 (Tex.
1989) (stating that the court was "reluctant to afford greater constitutional
protection to members of the print and broadcast media than to ordinary citizens"
and therefore holding that when a public figure sues a private individual, the
plaintiff must prove that the defendant made false and defamatory statements
about the plaintiff with actual malice).

19

the plaintiff must show negligence.[55]  Based on *Gertz* and *Dun & Bradstreet*, the

Texas Supreme Court has recognized that "in a defamation suit between private

[parties] concerning private speech, recovery of presumed and punitive damages

does not violate the First Amendment," but in even such cases, Texas requires

the plaintiff to prove at least negligence.[56]  That court has not addressed,

however, whether the plaintiff must prove fault when the suit is between private

individuals, concerns private speech, and is for defamation per quod (and thus

no damages are presumed).

Regarding proof of the truth or falsity of defamatory statements, a plaintiff

in Texas must prove that the statements are false if the defendant is a member of

the media and the statement is a matter of public concern.[57]  Neither the United

States Supreme Court nor the Texas Supreme Court has required proof of falsity

by more than a preponderance of the evidence.[58]  The Texas Supreme Court

has thus far not abrogated the common law rule that the truth is a defense in

---

[55]*Neely*, 418 S.W.3d at 61.

[56]*Hancock v. Variyam*, 400 S.W.3d 59, 65, n.7 (Tex. 2013).

[57]*See Hepps*, 475 U.S. at 776, 106 S. Ct. at 1563; *Neely*, 418 S.W.3d at 62.

[58]*See Bentley*, 94 S.W.3d at 587.

cases in which the defendant is not a member of the media and the statements are not on a matter of public concern.[59]

Because this case involves defamation posted on the internet, we make one more observation on the evolution of defamation law. In *Gertz*, one basis used by the Supreme Court for distinguishing between public officials and figures on the one hand and private individuals on the other was the "greater access to the channels of effective communication" that public officials and figures usually have compared with private individuals and the resulting "more realistic opportunity to counteract false statements," with the result that "[p]rivate individuals are therefore more vulnerable to injury."[60] Today, with the advent of the internet and the widespread use of social media, this assessment is less true than it once was.

Furthermore, the United States Supreme Court has recognized "the special and constitutionally recognized role of [the press] in informing and educating the public, offering criticism, and providing a forum for discussion and debate,"[61] entitling it to special protections under the First Amendment. Though

---

[59]*See Casso*, 776 S.W.2d at 555 n.3 ("We need not at this time decide whether every plaintiff in any defamation case, regardless of his status or that of the defendant, must prove falsity as an element of his cause of action."); *see also Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995) (continuing to apply the rule that "[i]n suits brought by private individuals, truth is an affirmative defense to slander").

[60]418 U.S. at 344, 94 S. Ct. at 3009.

[61]*Herbert v. Lando*, 441 U.S. 153, 189, 99 S. Ct. 1635, 1655 (1979).

21

the media still serves that important purpose, private citizens now have a greater ability to also serve that role, though usually to a lesser degree.

Neither the United States Supreme Court nor the Texas Supreme Court has seen the need to adjust defamation law in light of the changes in technology.[62]  Thus, for now, we continue to distinguish among categories of plaintiffs and defendants.[63]  With this background in mind, we turn to Cummins's issues.

### 2. Sufficiency of the Evidence to Show Defamation

In her first issue, Cummins argues that the judgment is erroneous because Lollar is a limited-purpose public figure who had the burden to prove that the statements Cummins made were false, and she failed to meet that burden. Whether a party is a limited-purpose public figure is a question of law for the court.[64]  In answering that question, courts use a three-part test.

First, there must be a public controversy or issue.[65]  In this context, the term "public controversy" means one that is "public both in the sense that people

---

[62] *See Kinney v. Barnes*, 443 S.W.3d 87, 100–01 (Tex. 2014).

[63] *But see Watkins & Schwartz*, *supra* note 25, at 849–50 (acknowledging that "public opinion is affected each day by the communications between millions of private persons," and "an individual's attitude toward political issues is formed not only by the institutional media, but also by communications in family groups, social groups, work groups, and peer groups in general" (citations omitted)).

[64] *Neely*, 418 S.W.3d at 70.

[65] *Id.*

are discussing it and [that] people other than the immediate participants in the controversy are likely to feel the impact of its resolution."[66] The controversy must be about some specific question, not merely a general concern or interest.[67] It does not include every matter in which the public is interested or that has attracted attention; "it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way," one that "has received public attention because its ramifications will be felt by persons who are not direct participants."[68] We may also look to whether "the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment."[69]

The second part of the test looks at the plaintiff's relation to the controversy; "the plaintiff must have more than a trivial or tangential role in the controversy."[70] As the United States Supreme Court has said, people classed as public figures have usually "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," thereby

---

[66] *Id.*

[67] *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 572 (Tex. 1998).

[68] *Einhorn v. LaChance*, 823 S.W.2d 405, 411–12 (Tex. App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.).

[69] *McLemore*, 978 S.W.2d at 572 (quotation omitted).

[70] *Neely*, 418 S.W.3d at 70.

inviting attention and comment.[71] The Texas Supreme Court has found it instructive to consider "(1) whether the plaintiff actually sought publicity surrounding the controversy; (2) whether the plaintiff had access to the media; and (3) whether the plaintiff 'voluntarily engag[ed] in activities that necessarily involve[d] the risk of increased exposure and injury to reputation.'"[72]

Finally, under the third part of the test, "the alleged defamation must be germane to the plaintiff's participation in the controversy."[73]

Cummins asserts that Lollar was "the subject of local and state-wide debate and discussion years before" Cummins's posting of statements about her on the internet. She points to numerous books and articles that Lollar had written in the years prior to Cummins's internship. These materials relate to the care and treatment of bats. These books do not show that Lollar was the subject of local and statewide debate.

Cummins does not explain what specific controversy the writings relate to or how, by writing the material, Lollar played a role in or inserted herself into the controversy.[74] And from our review of the record, we have found no such public

---

[71] *Gertz*, 418 U.S. at 344–45, 94 S. Ct. at 3009.

[72] *McLemore*, 978 S.W.2d at 573 (brackets in original).

[73] *Neely*, 418 S.W.3d at 70.

[74] *See Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S. Ct. 2675, 2688 (1979) (stating that before defamatory statements were made about the plaintiff, he had published writings that reached only "a relatively small category of professionals," that the plaintiff had not "thrust himself or his views into public

24

controversy. Cummins argues "[t]he controversy at issue here had and still has potentially far-reaching effects throughout the state" because BWS bats have tested positive for rabies and "[Lollar] also stated [that] she intends to treat bats with White Nose Syndrome[,] which is also contagious." But we found no evidence in the record showing that Lollar's writings about the care and treatment of bats related to any controversy about bats with rabies, that there is any specific controversy over the issue into which Lollar has injected herself, or that treatment of bats with White Nose Syndrome is a public controversy into which Lollar has involved herself.

We have found no evidence to support Cummins's contention that Lollar is a limited-purpose public figure. Based on the evidence in the record, we cannot say that any conclusion that Lollar was not a limited-purpose public figure was erroneous. We overrule Cummins's first issue.

In her second issue, Cummins argues that her statements were about matters of public concern because her comments were criticisms of Lollar's care of bats. For purposes of allocating the burden of proving the truth or falsity of a statement,[75] speech is on a matter of public concern "when it can 'be fairly

controversy to influence others," and that the defendants had "not identified such a particular controversy; at most, they point[ed] to concern about general public expenditures," a "concern is shared by most and relates to most public expenditures" and "is not sufficient to make [the plaintiff] a public figure").

[75]See *Klentzman v. Brady*, No. 01-11-00765-CV, 2014 WL 7205206, at *11 (Tex. App.—Houston [1st Dist.] Dec. 18, 2014, pet. filed) (op. on reh'g) ("Whether a plaintiff is a limited-purpose public figure who has involved himself in a public

25

considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'"[76] Cummins contends that because her statements were about matters of public concern—and we agree that allegations of animal cruelty can be a matter of public concern[77]—Lollar had to prove that Cummins's statements were false.

As noted above, neither the United States Supreme Court nor the Supreme Court of Texas has required a private plaintiff to prove the falsity of defamatory statements in suits against *nonmedia* defendants, even when the statements are on matters of public concern.[78] Lollar is not a public figure, and Cummins is not a media defendant, and therefore the defamatory statements are presumed false. But our disposition of this appeal would not change even if Lollar had to prove the falsity of the statements. As we discuss under Cummins's

---

controversy and whether an article addresses a matter of public concern are two separate legal inquiries with their own implications for defamation law.").

[76]*Snyder v. Phelps*, 562 U.S. 443, 131 S. Ct. 1207, 1216 (2011) (citations omitted).

[77]*See* Tex. Penal Code Ann. § 42.09 (making cruelty to livestock animals an offense), § 42.092 (West 2011) (making cruelty to domesticated living creatures an offense).

[78]*See Hepps*, 475 U.S. at 777, 779, 106 S. Ct at 1564, 1565 n.4. (stating that "placement by state law of the burden of proving truth upon *media defendants* who publish speech of public concern deters such speech" and that the Court was not considering "what standards would apply if the plaintiff sues a *nonmedia* defendant" (emphasis added)); *Randall's Food Mkts.*, 891 S.W.2d at 646.

third and fourth issues, Lollar met that burden on enough of the statements to support the trial court's finding of defamation. We overrule Cummins's second issue.[79]

In her third and fourth issues, Cummins asserts that the trial court erred by granting judgment for Lollar because Lollar did not present more than a scintilla of evidence that statements Cummins made met the elements of defamation. Because Cummins's brief argues these issues together, we shall address them together.

Cummins argues that the statements were not defamatory because (1) most of the statements are not verifiable assertions of fact and (2) they are not opinions that imply the existence of undisclosed facts because the statements "are linked to supporting files written by others including government agencies." She contends some of the statements were taken from reports made to government agencies, and the other statements are linked to documents written by government agencies,[80] which show the factual basis of her opinion.

This argument does not merit much discussion. While Cummins did post statements about her opinion of Lollar, Lollar's claim was based on other

---

[79]The Cambodia Wildlife Sanctuary's brief states that "actual documents and photographs" proved that Lollar committed animal cruelty. We commend the Sanctuary for its advocacy for the protection of animals, but if such documents or photographs exist, they were not included in the appellate record.

[80] *See Rehak Creative Servs.*, 404 S.W.3d at 732 (stating that linked documents were part of the context that had to be considered in addressing what a website conveyed about the plaintiff).

27

statements alleging facts about Lollar. To the extent that Cummins may have linked to government reports on her website, the record does not indicate to what documents or websites the hyperlinks in Cummins's online statements were directed, and the government communications that are in the record do not support Cummins's version of facts, as we discuss in greater detail below. We overrule this part of Cummins's third and fourth issues.

Similarly unpersuasive is Cummins's argument that some of the statements were taken from reports made to government agencies and therefore could not form the basis of Lollar's defamation claim. While a privilege can exist for statements made to government agencies,[81] Cummins was not making a report to a government agency when she posted the statements on her website. Furthermore, defamation privileges may be either absolute or conditional,[82] and Cummins does not tell us which type of privilege applies either to the statements she made to government officials or to her reposting of those communications, or why any such privilege applies.[83] We overrule this part of her third and fourth issues.

---

[81] *See Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 768 (Tex. 1987) (stating that not all communications to public officials are privileged).

[82] *Id.* (discussing defamation privileges and stating that the conditional privilege that applies to statements made in the public interest is defeated when the privilege is abused).

[83] *See* Tex. R. App. P. 38.1(i).

28

Cummins argues that one of the videos relied on by Lollar to show defamation was shared with Lollar's permission and therefore cannot support a defamation claim. The video shows Lollar performing an episiotomy on a pregnant bat in labor.

The argument is unavailing. Lollar alleged that Cummins had added captions to the video that mischaracterized what was happening in the video and in which she accused Lollar of animal cruelty. Assuming for the sake of this argument that Cummins had permission to post the raw video footage, she did not have (and does not argue that she had) permission to post the video as amended with those added captions. Lollar further testified that the video had been edited to be misleading in that Cummins removed the part of the video showing Lollar administering pain medication. Because it is the captions and editing that Lollar alleged were defamatory, it is irrelevant whether Cummins had permission to post the original, uncaptioned, unedited video. We overrule this part of Cummins's third and fourth issues.

Cummins further argues that ten of the complained-of statements are not about and do not refer to Lollar and do not meet the requirement that the defamatory statements point to Lollar and no one else.[84] The trial court admitted

---

[84] *Kaufman v. Islamic Soc. of Arlington*, 291 S.W.3d 130, 144 (Tex. App.—Fort Worth 2009, pet. denied) ("'In order to entitle one to maintain an action for an alleged defamatory statement, it must appear that he is the person with reference to whom the statement was made.'") (quoting *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 893 (1960)).

into evidence an exhibit consisting of hard copies of postings about Lollar on Cummins's Facebook, Twitter, and YouTube accounts, as well as pages discussing Lollar posted on Cummins's Animal Advocates website. This exhibit is nearly 100 pages long, and the statements complained of were primarily from these pages.

Of the ten statements, one specifically refers to "Defendants," and the rest were posted on the Animal Advocates website on a page dedicated to talking about Lollar and her lawsuit against Cummins. When looking at the statements in their context, it is clear to whom Cummins is referring in her statements. For example, as we discuss below, two of the statements allege that Lollar's dogs were neglected and that one of the dogs died from the neglect, and it is clear that it is Lollar who Cummins is accusing of the neglect.[85] We overrule this part of her third and fourth issues.

We now turn to the specific statements made by Cummins and her arguments about the sufficiency of the evidence to support the defamation finding. Most of statements fall into one of three categories: allegations that Lollar committed animal cruelty, allegations that Lollar committed fraud, and allegations that Lollar violated a law, rule, standard, or regulation.

---

[85] *See* Tex. Penal Code Ann. § 42.092 (making it an offense for a person to intentionally, knowingly, or recklessly fail unreasonably to provide necessary care for a domesticated animal in the person's care).

For most of the statements, Cummins argues that Lollar failed to prove that the statements were false. And for most of the statements, Cummins either expressly asserts that she proved the statements are true or points to some place in the record that she contends shows the truth of the statement. Cummins further argues that most of the statements are not capable of a defamatory meaning.

*Allegations of Animal Cruelty*

Cummins accused Lollar of cruelty to bats and to two of Lollar's pet dogs. Cummins claimed that one of the dogs had severe periodontal disease because of Lollar's neglect and that rather than have the condition treated, Lollar had the dog euthanized. Cummins claimed that another dog could not walk and had to drag itself around by its front legs and that it had nails so long that it could not stand.

The gist of Cummins's statements about the dogs is that Lollar's veterinarian records show that when Lollar's dog had moderate periodontitis, the veterinarian recommended treatment, but instead, Lollar refused treatment and considered euthanizing the dog. Lollar then neglected treating her dog until the dog was in poor condition and was in so much pain it could not eat, at which point Lollar had the dog euthanized. Cummins asserted that the dog "died from neglect of care" and that "[i]t's all in her vet records."

In another paragraph, in which Cummins also accused Lollar of letting two bats die from neglect and impersonating a doctor to illegally obtain rabies

31

vaccines, Cummins again asserted that Lollar ignored her veterinarian's advice to have her dog's teeth cleaned. Elsewhere Cummins made the statement that "[o]n top of this her old dog that was euthanized was in really bad shape. One had end stage periodontal disease with tons of tartar. Why didn't she have her vet clean the dog's teeth instead of letting it get worse?"

Cummins asserted that Lollar's other dog could not walk and could only drag herself by her front legs and that during pretrial proceedings Lollar kept changing her story about whether the dog could walk or not. Cummins stated, "There is something really wrong here for her to make up these stories," and "Why not get [the dog] a cart? I would not let my dog drag itself around." Elsewhere on her website, Cummins stated that Lollar's lying about the matter "seems pathological."

All of Cummins's statements on the matter are defamatory per se because they are directed at Lollar, Lollar is a wildlife rehabilitator and conservationist, and these statements accuse her of, at a minimum, animal neglect. These statements do not merely generally disparage her character or reputation; they ascribe to Lollar "conduct, characteristics[,] or a condition that would adversely affect [her] fitness for the proper conduct of [her] lawful . . . profession," and as such, they injure her in her profession.[86]

---

[86] *See Hancock*, 400 S.W.3d at 66–67 (citing the Restatement (Second) of Torts to "more fully define" a statement "that injures one in her profession").

Cummins argues that some of her statements described what she witnessed at BWS, and the rest of the information she posted came directly from veterinary records produced by Lollar in discovery, which Cummins says she linked to on the webpage on which the statements were posted. But we cannot say exactly what the veterinarian records contained because Cummins did not introduce those records into evidence. We may not take Cummins's word for it that the website linked to the records or that the records say what she contends they do.[87]

Cummins also contends that Lollar's actions "meet the legal definition of animal neglect" and that her statement to that effect was her opinion, not a fact on which a defamation claim may be based. But the statements that she used to explain the basis of her opinion are set out as affirmative facts, and those facts are defamatory. Furthermore, Cummins does not cite any authority for the proposition that Lollar's actions meet a legal definition of animal neglect.[88] The penal code's definition of cruelty to a nonlivestock animal includes a person's act of intentionally, knowingly, or recklessly failing "unreasonably to provide necessary . . . care . . . for an animal in the person's custody,"[89] but as we

_____

[87] *See Hotchkin*, 2014 WL 7204496, at *6 (observing that we generally may not consider matters outside the appellate record).

[88] *See* Tex. R. App. P. 38.1(i) (requiring citations to relevant authority for the arguments made in an appellant's brief).

[89] Tex. Penal Code Ann. § 42.092(b)(3).

33

discuss next, Lollar produced evidence that she did not fail to provide necessary care for her dogs.

From our review of the record, the only evidence that supports Cummins's statements about the dog that could not walk was her own testimony. Cummins stated that "when I was there, I saw [the dog] dragging herself. I did not see her run and jump." And she stated that Lollar's dogs all had long nails, which Cummins believes is cruel. Cummins asserts that one of her trial exhibits includes a photograph of the dog with long rear claws, that she never saw the dog stand, and that she only saw it drag itself. The exhibit she refers to contains 189 pictures, and she does not tell us to which picture she refers. We found ten pictures with dogs in them. We cannot tell from the pictures whether any of the dogs in the pictures have nails so long they would prevent a dog from standing. None of the pictures show a dog having difficulty walking. As far as the dog she alleged died from neglect, the only evidence that supports Cummins's statements is the testimony of Lollar and her veterinarian that the dog did have periodontitis.

Lollar, contrary to Cummins's argument, produced evidence that showed the statements were false. Lollar stated that it was not true that one of her dogs could not walk and had to drag itself. Lollar acknowledged that one of her dogs "had a form of periodontitis," but she went on to explain that

> [h]e was 19 years old when he was euthanized. It was too late to have any dental work done on him. Up until that point, he had maintained a very healthy mouth. But when an animal reaches an age that they're too old to have anesthesia administered, there is no way to do any dental work on them because they might not wake up

34

from surgery. He was also at the very end of his life. He was euthanized after he collapsed a—a few weeks after that.

Dr. Tad Jarrett testified at trial. Dr. Jarrett is a Mineral Wells veterinarian who worked with Lollar to develop standards of care for bats and whose practice treats Lollar's dogs. Cummins asked him about his treatment of the dog with periodontitis. He testified that the dog "was nearing the end of his life" and "probably had some degree of periodontitis." When asked if he advised Lollar to treat the dog for the condition, he stated, "[y]ou know, that's standard recommendation for any dog with dental tartar." When Cummins asked if Lollar had asked him to euthanize the dog, Dr. Jarrett clarified that Lollar had not; she had at one point asked him to evaluate the dog only to "see if it was time" because "she didn't know for sure, you know, and she was worried about his overall health." An associate veterinarian that worked for him was the person who eventually euthanized the dog, and Dr. Jarrett stated that he was sure his associate had made the correct decision.

Dr. Janet Messner, a South Dakota veterinarian who visited BWS in 2011 to be trained by Lollar on bat care, testified by deposition. She stated that Lollar's dog did not drag herself around. She testified that the dog had had "some repair done, . . . probably thousands of dollars worth" and when she was at BWS in the year after Cummins was there, the dog could walk and run. And she stated that none of Lollar's dogs seemed neglected or mistreated.

Sara Kennedy, a BWS volunteer in July 2010, testified by deposition and was asked about the dog with periodontitis. She stated that he "ate and acted pretty much normally" for a dog of his age. The dogs she saw at BWS were not too thin or overweight and did not have overgrown claws. When asked specifically about the dog that Cummins claimed had to drag herself around, Kennedy stated that she walked and ran. All the dogs she saw seemed "happy, healthy, decently fed, well[-]groomed."

Kay Singleton testified for Cummins. Singleton was an intern at BWS at the same time as Cummins and left the program early with Cummins. She stated that she did not have a pleasant experience at BWS. But despite not being favorably-minded toward Lollar, she did not testify that the dog Cummins spoke of could not walk. Asked if she saw the dog run and jump, Singleton only stated, "I don't think any of them ran and jumped, as I recall they're all old." When asked if any of the dogs dragged their legs, she stated that she could not recall much about the dogs. Thus, Singleton's testimony, though not helpful to Lollar, was also not helpful to Cummins. We hold that the testimony of Lollar, Dr. Messner, Dr. Jarrett, and Kennedy was sufficient to support a finding that Cummins's statements about the dogs were false.[90] We overrule her third and fourth issues as to these statements.

---

[90] See Bentley, 94 S.W.3d at 587 (stating that the preponderance of the evidence standard applies to reviewing proof of falsity in a defamation case).

Cummins also made allegations that Lollar committed cruelty toward bats. She stated that Lollar's attorney was working for someone who commits animal cruelty, and it is clear from the context of the statements that Lollar is the person to whom Cummins was referring. Cummins stated that Lollar's method of euthanizing bats is inhumane and causes the bats to die of suffocation. Lollar uses the inhalant anesthetic Isoflurane for anesthesia and for euthanasia, and Cummins alleged that Lollar's use of the drug is illegal, inhumane, and unsafe.

Cummins further stated that Lollar never washed her hands before surgery, referencing a picture she took of Lollar that she claimed backed up her statement, and she alleged that Lollar pulled molars out of a conscious bat. Cummins then stated that bat experts "know that bats must be unconscious and intubated." She asked rhetorically, "Can you imagine the pain that bat felt?" She referred to Lollar's anesthesia technique as "cave man veterinary practice."

Cummins also accused Lollar of experimenting on bats, claiming that "[t]he bats are dying because she doesn't take them to the vet." Elsewhere in the paragraph in which this statement appeared, Cummins stated that Lollar performs C-sections and amputation on bats even though Lollar is not a veterinarian. Thus, the "experimenting" that Cummins appeared to be referring to is performing surgery on bats without a veterinarian license.

In another statement, Cummins accused Lollar of "hacking an animal to death." This statement correlates with other statements in which Cummins disagreed with Lollar's version of what happened during the episiotomy that

37

Cummins filmed, and in which she stated that Lollar "really needs to get her vision checked."

As noted above, Cummins also posted the video of Lollar performing an episiotomy, to which she added captions accusing Lollar of causing the bat's uterus to prolapse and of causing the bat to die from the procedure. On the YouTube page on which Cummins posted the video, she added text underneath the video box that states, "A woman performed a double episiotomy on a bat. The bat had no local anesthesia. The baby died. This person is not a veterinarian." The first frame of video is a page of text stating, "This bat was about to give birth. Amanda Lollar of Bat World Sanctuary decided to do an episiotomy. She did not give the bat pain relief. She is not a veterinarian. GRAPHIC ANIMAL CRUELTY!!!" Then during the video, the following captions were added:

"Amanda cuts the bat's vagina with scissors three times
Bat convulses near the end then passes out from schock [sic]"

"She can't tell the difference between a foot and baby's head
Amanda pulls too much and bat's vagina, uterus prolapse"

"Mom bat passes out from shock
She later dies"

"Baby is pink yet dead. It had just died."

The last frame of the video displays text that states, "Amanda tries to glue the incisions closed. She accidently glued [the bat's] vagina shut. Mom later died. Report Amanda Lollar for animal cruelty and neglect." These statements

38

disparaging Lollar's treatment of bats and accusing her of cruelty toward them are defamatory per se because they injure Lollar in her profession as a bat rehabilitator and as an expert in bat care.[91]

To prove the truth of these statements, Cummins relied primarily on her own testimony. Cummins testified that at BWS, she witnessed unspecified violations of unspecified provisions of the Health Code, of Texas Parks & Wildlife regulations, and of "the Animal Welfare Act." She testified that a veterinarian's prescription is needed to use Isoflurane, that Lollar used Isoflurane "to basically OD [bats] to euthanize them," and that Lollar "performed surgery with anesthesia without a veterinarian license or oversight and bats had been dying because of the violations."

Cummins was asked why she stated online that Lollar had obtained Isoflurane illegally, and Cummins responded, "[S]he didn't tell me she got it from her vet, she just told me she that has a source. It didn't sound like it was legal." She testified that she "would think if it was a veterinarian [Lollar] would have told [her], so [she] assumed it was another source." Lollar's attorney asked her, "At the time you posted on the Internet that she was using Isoflurane illegally, you did not know when you posted that whether she had gotten the Isoflurane from a vet and was using it under the vet's supervision?," to which Cummins stated, "Correct." But she also stated that she still believed Lollar was using Isoflurane

---

[91] See Hancock, 400 S.W.3d at 64, 66–67.

39

illegally because Lollar did not administer it using the nebulizer method listed on the label, and she believed that Lollar's off-label use of the drug made the use illegal.

Regarding the episiotomy video, in her brief, Cummins cites a page from the record as evidence that the captions are true. That page of the testimony does not contain any evidence relating to the truth or falsity of the captions. She asserts that Lollar admitted that the video shows Lollar performing an episiotomy. But Lollar never denied that the video showed her performing an episiotomy; her disagreement was over the content of the captions.

Cummins admitted that she had never performed an episiotomy and had never seen one done before she witnessed the one in the video. But she felt that she was qualified to say what was happening in the video because she had "done some research and asked questions" before she published the captions. When asked why she believed that the bat from the episiotomy video had died, she admitted that she just *assumed* she had died because she could not find the bat after the surgery when she looked for her.

We have not found evidence in the record proving by a preponderance of the evidence the truth of Cummins's captions that she added to the episiotomy video. Instead, the record shows that Cummins made assumptions that she represented as verifiable facts.

Lollar, on the other hand, produced evidence refuting the content of the captions. Lollar testified that the bat did not pass out from shock; that a person

40

cannot use general anesthesia on a bat for this type of procedure and that she gave the bat appropriate pain relief; that the bat jerked a little because she did not want to be held, but she was not convulsing; that no prolapse occurred; that she did not accidentally glue the bat's vagina shut; that the bat pup was stillborn; that the mother bat did not die and was released a few weeks after the procedure; and that the method she follows is approved by her veterinarian.

Dr. Jarrett, who trained Lollar to perform episiotomies, testified that he had seen the video and that the procedure was "textbook" and "as good as it can get." He further stated that the anesthetic was used properly and that no prolapse had occurred.

Dr. Messner testified that she had seen the video, that the episiotomy was done properly, and that she had "absolutely" no criticisms of how the procedure had been done. Applying the appropriate standard of review, this evidence is legally sufficient to show that the captions that Cummins added were false.

As for Cummins's other statements about Lollar's treatment of bats, Lollar testified that Isoflurane is commonly used in wildlife rehabilitation centers, and wildlife rehabilitators can procure it through a veterinarian that they work with. It is not a substance that requires a DEA license. Lollar testified that the method Cummins claimed was required to humanely and legally administer the drug is one that is not always recommended or used. She testified that the method that she uses is one that researchers and professionals in the field use and that the

41

American Veterinary Medical Association recommends the method of euthanasia she uses as a humane method of euthanasia.

Dr. Jarrett testified that Lollar's use of Isoflurane to euthanize bats is not illegal. Dr. Messner stated that the nebulizer method of administering Isoflurane is not always recommended for bats and that she uses the same method as Lollar. The evidence is sufficient to support a finding that Cummins's defamatory statements about Lollar's use of Isoflurane were false.

Regarding Lollar's method of extracting teeth from bats, Lollar testified that the method she uses is one that she developed in conjunction with Dr. Jarrett. The method, which involves applying a powerful topical anesthetic that is used for dental extractions, was developed to be as pain free as possible. She stated that microbats cannot be rendered completely unconscious with general anesthesia for the procedure "because the cone that you would use to place over their face to knock them out would be directly in your way" and "you wouldn't be able to extract the tooth." She further stated that "[i]t takes, literally, a second to extract the tooth," but it takes five to fifteen minutes to render a bat completely unconscious, so "it's not practical and it's not safe to anesthetize a bat under general anesthesia just to extract a tooth."

Dr. Jarrett testified that in Texas, a person does not have to be a licensed veterinarian to perform tooth extractions or episiotomies on bats. And he stated that he taught Lollar how to perform those procedures. He further stated that he had never seen Lollar commit animal cruelty.

42

Dr. Messner stated that she has never done a tooth extraction on a bat, but if she did, she would use the same drug that Lollar uses. And she testified as Lollar had that a person cannot use a cone to completely anesthetize a bat in that situation; "you couldn't do it. . . . [I]t really extends the procedure and it makes it difficult." This evidence is sufficient to support a finding that Cummins's statements about Lollar's surgery on bats were false.

In a video played at trial of Lollar treating a bat, she explained that her hands were dirty in the picture because she had just rescued the bat, which was a starving orphan bat, and she wanted to get him cleaned up and treated as quickly as possible. Dr. Messner testified that when she visited BWS, the facility was clean, the clinic was kept in sterile condition, and the room that Lollar uses for emergency surgeries was "absolutely" sanitary enough for procedures. Kennedy testified that the facility was cleaned at least once a day. And Lollar testified that Cummins's complaints resulted in her being investigated by various law enforcement and government agencies, and they all reported that they found no violations at BWS. We hold that Lollar showed by legally sufficient evidence that the statements that Cummins made that alleged animal cruelty or neglect were untrue and that Cummins did not produce sufficient evidence to prove that the statements were true. We overrule issues three and four as to these statements.

Cummins further challenges the judgment of defamation as to three webpages that she was ordered to remove in their entirety. In her argument

43

regarding these three pages, she specifically challenges only one statement on each page. We cannot determine from the appellate record whether these three statements appeared on those three particular pages because the judgment does not explain the contents of those pages and copies of the pages do not appear in the record before us. Thus, although the substance of these three statements was discussed at trial, we cannot tell from the appellate record whether they appeared on these particular webpages. As to the substance of these three statements, however, the trial court did hear evidence about whether they were true or defamatory.

One of these three statements that Cummins argues was neither false nor defamatory was this statement: "An email from the warden to Texas Parks & Wildlife stating that bats are breeding in Lollar's facility." Although we did not find this particular statement on the copies of Cummins's internet postings that were introduced at trial, the parties did introduce evidence about whether wardens with the Texas Parks and Wildlife Department had found Lollar guilty of illegally breeding bats at BWS in violation of its permit. As we explain in more detail below, the evidence was sufficient to support a finding by the trial court that Cummins's statements to that effect were false and defamatory.

The second of these three statements was, "Amanda Lollar's 1994 manual which she wrote. She stated that she euthanizes bats by freezing them to death which is illegal and inhumane according to the AVMA and bat experts." One of the three webpages Cummins was ordered to remove included in the URL

44

"amanda_lollar_1994_manual_original.pdf," and the parties agreed that Cummins posted a copy of a 1994 manual that Lollar wrote about the care of bats. And regardless of whether this particular statement appeared on this particular webpage, the evidence showed that Cummins asserted multiple times on her website that the method of euthanasia that Lollar recommended in the book was illegal and inhumane according to experts. This statement was defamatory per se because it injured Lollar in her profession, and Lollar introduced evidence sufficient to support the judgment that Cummins's statements on the subject were false.

The procedure that Lollar recommended involved putting a bat in a refrigerator to induce torpor and then placing the bat in the freezer. Cummins posted online that by the time Lollar published her manual, experts had known for decades that the method she recommended was inhumane. Cummins made a number of statements on this subject, all suggesting that Lollar is incompetent, that she is not knowledgeable about the care of bats, and that her ignorance led her to use and recommend methods of care that were cruel. Dr. Messner and Lollar testified that while today the procedure is not recommended except in certain situations, at the time the book was written, the method Lollar recommended was not considered inhumane. And Lollar clarified that while the AVMA finds *rapid* freezing of conscious animals to be inhumane, that was not the method she had previously recommended, and the method that she had recommended was one that, at the time, had been used by researchers for

45

years. Cummins introduced no evidence that contradicted Lollar's evidence on the matter. Thus, the evidence supports a finding that Cummins's statements about Lollar's recommended euthanasia methods were not true.

The third statement was a description of an altered photograph, which Cummins described thusly: "A photo that defendants made of me. They took a photo of my face and photoshopped semen on my face." Although the judgment did not specify that this statement had to be removed, and we did not find in the record the page on which she contends the statement appeared, she was ordered in the judgment to remove a similar statement. Cummins contends that the judgment was improper as to this statement because the statement was not about Lollar, it was about a friend of Lollar's who Cummins claimed had posted the picture. But the statement refers to "defendants," and thus this statement does refer to Lollar. Moreover, the other statement about the photograph that she was ordered to remove refers to "these people," and it is clear from its context that Lollar is included in "these people." Thus, Cummins's argument that her statements about this picture do not refer to Lollar and therefore cannot support defamation is not persuasive. Cummins makes no other argument challenging the judgment as to her statements about the photograph.[92]

Other than these three statements, Cummins does not challenge the judgment as to any statements contained in the three webpages that she was

---

[92] *See* Tex. R. App. P. 38.1(i).

ordered to remove.[93]  We therefore do not consider whether the evidence was insufficient to support a finding that the statements contained on those pages were false or defamed Lollar.  We overrule Cummins's third and fourth issues as to the webpages she was ordered to remove.

*Allegations of Fraud*

Cummins made a number of statements alleging that Lollar committed fraud.  At one point, she stated that Lollar took money that BWS had received from the dissolution of another group and used it to buy a vehicle.  Cummins stated, "That money was supposed to go for animals. This is what Lollar does with money that is given to" BWS.  In another statement, Cummins stated that Lollar bought a bag from Walmart and told Cummins she would use the bag and then return it.  Cummins stated that Lollar "admitted to [Cummins] with an evil laugh that she does this frequently."

These statements are defamatory per se because, since Lollar runs a nonprofit organization that relies on donations as its primary source of income, allegations of fraud injure her in her profession.  Neither Cummins nor Lollar produced evidence that specifically discussed whether Lollar used money that BWS received from the dissolution of another organization to buy a vehicle.  We therefore disagree with Cummins that she proved that the statements were true. Cummins argues that Lollar admitted this was true in her deposition, but the only

---

[93] *See id.*

47

citation to the record she supplies to support this statement is Cummins's own internet postings. Furthermore, although Cummins characterized this statement as an example of Lollar's misusing funds, even if the money received was used to buy a vehicle, nothing in the record indicates that this was an improper use of the funds.

As to the second statement, neither Cummins nor Lollar provided testimony or other evidence about whether Lollar regularly buys merchandise, uses it, and then returns it. Thus, this statement was not proven either true or false. But even were we to hold that Lollar had the burden to prove the falsity of the statement and it was therefore error for the trial court to order Cummins to remove it, Cummins has not shown how she was harmed, particularly when, even without this statement, the evidence is sufficient to support the judgment on Lollar's defamation claim.

Furthermore, the point of the statements—that Lollar uses donations fraudulently and engages in unethical behavior—was something that both sides briefly presented testimony on. Cummins testified that she told the IRS that Lollar was using BWS as her own personal piggy bank and was paying personal expenses out of the nonprofit. She acknowledged that she had posted online that Lollar was committing fraud on the BWS donors and that she knew that she was accusing Lollar of a crime when she said that.

Cummins also acknowledged that she had posted online an accusation that Lollar might be collecting welfare illegally. After seeing a police report

48

stating that Lollar had called the police for a "welfare check," Cummins stated online that Lollar owned property, and so if Lollar was receiving welfare, she was doing so illegally. Cummins stated that she thought the report—which included a note that said, "Unable to locate. Building locked"—indicated that Lollar had lost a welfare payment check and called the police to help her find it.

Cummins explained that she "believed [the statement] to be true" when she said it, that she posted it because she wanted to show what type of person Lollar is, that she said it was only illegal "if" Lollar was collecting welfare, and that she took the post down a few hours later when someone online pointed out that the report probably meant that Lollar had asked the police to check on someone's welfare.

Lollar testified that she was not paying her personal expenses out of the nonprofit corporation and that it was not true that she had committed fraud on her donors. She also stated that she had never committed welfare fraud and had never been on welfare. The trial court as the fact finder could believe Lollar and disbelieve Cummins,[94] and, accordingly, Lollar provided sufficient evidence that Cummins's statements that Lollar commits fraud on her donors, uses BWS funds for her personal expenses, and was committing welfare fraud were false.

---

[94]*See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (stating that when faced with conflicting evidence, the factfinder can believe one witness and disbelieve others).

49

*Allegations that Lollar Violated a Law, Rule, Regulation, or Standards*

Cummins made numerous statements alleging or implying that Lollar violated a law, rule, standard, or regulation. In several of the statements Cummins was ordered to remove, she stated that Lollar had been found guilty of illegally breeding bats in violation of BWS's wildlife permit. Lollar testified, however, that she does not intentionally breed or intentionally allow breeding of the bats in the captive colonies at BWS. BWS neuters the fruit bats as soon as they come of age, but nevertheless, breeding does occasionally take place accidentally because "[y]ou can't monitor exactly when they're ready to be neutered." Lollar also stated that she does not have a permit for the fruit bat captive colony because none is required. Thus, if BWS had been breeding fruit bats, it would not have been in violation of a permit.

Lollar acknowledged that BWS's permit for its insectivorous colony prohibits "propagating" bats, but Lollar also testified that accidental breeding is not considered a violation of the permit. She stated that she had allowed breeding in the colony for a study done with a bat conservation organization but had done so with the knowledge of the Texas Parks and Wildlife Department.

Lollar further testified that game wardens from the Texas Parks and Wildlife Department had inspected the facility and found no violations from accidental breeding. She stated that BWS is periodically inspected by the agency and that BWS has always passed those inspections, it has never been

50

reprimanded by the agency, and its permit has never been suspended or revoked.

Lollar introduced into evidence a copy of an email exchange that Cummins had had with a staff attorney at Texas Parks and Wildlife, who informed Cummins that the agency had found no violations by BWS. In that email, the attorney stated,

> This is to advise you that TPWD will not be responding to any further allegations from you concerning Amanda Lollar's facility. Representatives of the TPWD Law Enforcement Division visited that facility earlier this year and found no violations of the Texas wildlife laws. In light of this information and your baseless claim that someone at TPWD is libeling and defaming you, we consider the matter closed.

Lollar thus produced evidence that she is not breeding the bats in the BWS captive colonies in violation of BWS's permit and that she has not been found guilty of violating the permit.

Lollar testified that Cummins's statements were damaging because if the bat conservation community believed that she had been found to be illegally breeding bats, "[n]o one would want to work with [her] anymore." But her testimony explaining the damaging nature of the statements was unnecessary because the statements are defamatory per se. They accuse Lollar of intentionally violating the permit under which BWS is allowed to keep one of its captive colonies, and they therefore damage her in her profession.

Cummins did not produce any proof that Lollar had been found guilty of causing BWS to violate its permit or that Lollar was incorrect in her

51

understanding that accidental breeding is not a violation of the permit. Under the applicable standard of review, this evidence is sufficient to support the trial court's finding that Cummins's statements about Lollar's breeding bats and thereby violating BWS's permit were false.

Cummins was also ordered to remove statements that BWS had been forced by the health department to leave the city because of all the complaints to the city and the health department, and that the city had had to gut the building BWS had been in.[95] These statements are defamatory per se because they injure Lollar in her profession by implying that BWS's premises, where it houses captive bat colonies and out of which it runs its operation (and where it performs certain emergency treatment on bats), was so ill-kept that it rendered the building it was in unfit for habitation.[96]

Lollar testified that there was no truth to these statements. Lollar sold the bottom half of a building she owned, and unneeded items had been stored in that part of the building, so she contacted a local church to come pick up those items. The new owner moved those boxes to the sidewalk for the church to pick up from there. Lollar stated that the police had been called by someone who was unhappy that the boxes were out on the sidewalk. Lollar stated that the police

---

[95]Cummins did not clarify whether she meant the City of Mineral Wells's health department, the Texas Department of State Health Services, or some other government entity.

[96]*See Hancock*, 400 S.W.3d at 66–67.

52

mistakenly wrote up that the building was being gutted.  The police report was not included in the record, but Lollar testified that there was no truth to Cummins's statement that BWS was evicted from the building or asked to leave the city.

Lollar's testimony is evidence that the police report stated the building was being gutted.  The defamatory nature of Cummins's statement arose, however, not from her publishing the contents of the report—that the building was being gutted—but from her embellishment of the report.  She stated that the health department forced Lollar and BWS out of the building and that the building was in such poor condition that it *had* to be gutted and cleaned.  Lollar's testimony was evidence that Cummins's statements to that effect were false, and Cummins provided no evidence to the contrary.

Cummins made various statements about Lollar that related to rabies.  She stated that Lollar was breaking the law by illegally obtaining human and animal rabies vaccinations and that Lollar had told her that the place where she buys her rabies vaccine thinks she is a doctor.  She stated that Lollar exposed interns to rabies by not checking their vaccination cards to ensure that they had been vaccinated against rabies.  And she stated that Lollar handled rabid bats with her bare hands, implying that Lollar was not knowledgeable about how to handle bats.  These statements are defamatory per se because they injure Lollar in her profession, and at least one accuses Lollar of a crime.

53

To prove the truth of these statements, Cummins relied primarily on her own testimony.  She stated that while at BWS, Lollar told her to give rabies vaccinations to bats.  Cummins stated that only veterinarians can administer rabies vaccinations to bats.  Cummins testified that she reported Lollar to authorities for giving vaccinations to bats.  And she reported Lollar for having the human rabies vaccine because only a doctor, nurse, veterinarian, or pharmacist may have it.  She further stated that Lollar told her that she buys the vaccine from a company that thinks she is a doctor.

Cummins also testified that while she was there, Lollar held a possibly rabid bat in her bare hands.  She testified that she had always been told never to touch a bat with bare hands, something "all the bat experts know," yet Lollar told her not to wear gloves when handling bats.  She stated that Lollar told her to hold in her bare hands a bat that Lollar said was possibly rabid.  Cummins testified that neither Lollar nor anyone else asked for proof that she had been vaccinated against rabies before beginning her internship.

Kay Singleton testified that Lollar did not tell her to give rabies vaccinations to bats.  She also testified that although she had proof of pre-exposure rabies vaccination, Lollar did not ask to see it.

Lollar stated that she buys the human rabies vaccination but not the animal rabies vaccine.  She used to buy the animal rabies vaccine when it was legal for anyone to do so, but at some point in the 1990s, the law changed.  Lollar stated that she is not violating the law by buying the human rabies vaccine.  She buys it

54

from Novartis, Novartis knows she is not a doctor, and she works with a veterinarian to legally obtain the vaccine.

Lollar explained that BWS works with a nurse practitioner at a doctor's office who accepts people from BWS on a walk-in basis and who administers the vaccine if needed. She stated that despite the implication from Cummins's posting that Lollar personally administers rabies vaccinations to people, she does not. Lollar will give the vaccine to interns to take to a nurse for administering it, but she does not administer vaccines herself.

Regarding holding rabid bats with her bare hands, Lollar testified that while Cummins was there, she held in her bare hands a bat pup that was displaying neurological symptoms that could be the result of either pesticide poisoning or rabies, and that she was about to euthanize the bat because "[t]here is no way to save an animal that has those type of symptoms." She explained that bat pups do not have teeth that can break the skin, so "any researcher might" hold such a pup in his or her bare hands. According to Lollar, "[i]t's done all the time" by researchers, biologists, and other professionals. Lollar testified that Cummins made the statements about holding rabid bats in her bare hands to make it look like Lollar did not know what she was doing, how "dumb [she] must be to be holding a rabid bat in [her] bare hand."

Regarding proof of rabies vaccinations, Lollar testified that someone else with BWS coordinated the internships the year that Cummins came. That person was in charge of checking for proof of rabies vaccinations, and Lollar relied on

55

that person's report about whether the interns were vaccinated. Lollar stated that no one can attend a BWS internship who has not been vaccinated.

Lollar further testified that because of Cummins's allegations, the Centers for Disease Control called every intern who had been at BWS in the previous year to talk to them about their experience and about BWS protocols. The only change to BWS protocols that the CDC recommended was that instead of recommending that interns wear gloves when working with certain species, BWS should make it a requirement.

Dorothy Hyatt, vice president of BWS, testified that she had never seen Lollar administer a rabies vaccine to a person. Kennedy testified that she received a rabies booster shot while on her last day at BWS, but it was administered to her at a doctor's office, not at BWS. Nobody at BWS administered any type of shot to her. Lollar testified that she provided the vaccine to Kennedy but did not administer it to her—she drove Kennedy to the doctor's office where the nurse practitioner administered it.

Kennedy stated that she was required to show proof of pre-exposure rabies vaccination shots before beginning her internship. And Kennedy testified that she was encouraged to wear gloves while at BWS. We hold that the evidence was sufficient to support the trial court's judgment as to statements relating to Lollar's violations of rules, regulations, standards, and laws, and we overrule Cummins's third and fourth issues as to these statements.

56

Also under these issues, Cummins argues that she was not given a copy of the specific statements that Lollar and BWS alleged to be defamatory until after the trial had concluded, and she could not defend the statements without knowing what they were before trial. Lollar's petition stated that Cummins had posted and was continuing to post defamatory statements about Lollar online. If Lollar's petition did not provide enough specificity for Cummins to know which statements she would need to defend, Cummins could have specially excepted to Lollar's petition.[97] No such special exceptions appear in the appellate record.

Cummins also challenges the judgment against her based on statements in exhibit 18, which she contends were made by people other than her. And she complains that the exhibits containing the defamatory statements were never authenticated. Cummins did not object to a lack of authentication as to exhibit 18.[98] And, as she acknowledges, none of the statements she was ordered to remove were in exhibit 18.

Cummins did object that exhibit 17 had not been authenticated, and the trial court overruled her objections. But she does not argue, nor do we discern from our review of the record, how she was harmed by any lack of authentication of the exhibits containing the statements, particularly when she admitted at trial

---

[97] *See* Tex. R. Civ. P. 90, 91.

[98] *See* Tex. R. App. P. 33.1.

to making the statements in the exhibits that we have held were defamatory per se.[99]

Finally, Cummins complains about being ordered to remove the episiotomy video. She asserts that she introduced evidence that the video is the truth and that Lollar did not produce evidence that the contents of the video are false because Lollar admits that it is a video of her performing an episiotomy. As we stated above, Lollar did not contend that the video does not depict her performing an episiotomy. She complained that the video's editing and the added captions were defamatory. And, as stated above, Lollar proved that the video as edited by Cummins was false. We overrule the remainder of Cummins's third and fourth issues.

### 3. Defamation Damages

In her fifth issue, Cummins challenges the damages awarded to Lollar for defamation. Regarding the compensatory damages award, her argument under this issue relates only to economic damages, and she includes no argument relating to any of the other categories of damages that Lollar pled and introduced evidence on. We overrule her issue as to the compensatory damages award.[100]

---

[99] *See* Tex. R. App. P. 44.1(a).

[100] *See Britton v. Tex. Dep't of Criminal Justice*, 95 S.W.3d 676, 681 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (stating that "[g]enerally speaking, an appellant must attack all independent bases or grounds that fully support a complained-of ruling or judgment"); *see also* Tex. R. Civ. P. 38.1(i).

58

As for exemplary damages, Cummins argues that Lollar produced no evidence of malice and that Cummins's net worth does not support the amount of the award. Cummins did not timely raise these complaints in the trial court, but because this is an appeal from a bench trial and these complaints challenge the sufficiency of the evidence to support the damages award, she may raise them for the first time on appeal.[101]

Chapter 41 of the civil practice and remedies code provides that generally, to be entitled to exemplary damages, a plaintiff must show fraud, malice, or gross negligence by clear and convincing evidence.[102] "Malice" in this context means "a specific intent by the defendant to cause substantial injury or harm to the claimant."[103] Additionally, in a defamation action, the Texas Supreme Court has stated that "recovery of exemplary damages are appropriately within the guarantees of the First Amendment if the plaintiff proves by clear and convincing evidence that the defendant published the defamatory statement with actual malice."[104]

---

[101] *See* Tex. R. App. P. 33.1(d).

[102] Tex. Civ. Prac. & Rem. Code Ann. §§ 41.002(b), 41.003(a) (West 2015).

[103] *Id.* § 41.001(7).

[104] *Hancock*, 400 S.W.3d at 66. After this case was tried, the legislature enacted a statute providing that a defamation plaintiff may not recover exemplary damages without first serving a request for a correction, clarification, or retraction. *See* Tex. Civ. Prac. & Rem. Code Ann. § 73.055(c) (West Supp. 2014).

Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.[105] This intermediate standard of proof falls between the preponderance standard of proof applicable to most civil proceedings and the reasonable doubt standard of proof applicable to most criminal proceedings.[106] While the proof must be of a heavier weight than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed.[107] In evaluating the legal sufficiency of the evidence under the clear and convincing standard of proof, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true.[108]

In determining what amount of exemplary damages to award, the factfinder must consider any evidence relating to (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of the wrongdoer's culpability; (4) the situation and sensibilities of the parties concerned; (5) the extent to which

---

[105]Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2); Tex. Fam. Code Ann. § 101.007 (West 2014); *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012); *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010).

[106]*In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).

[107]*Addington*, 588 S.W.2d at 570.

[108]*K.E.W.*, 315 S.W.3d at 20; *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008), *cert. denied*, 290 S.W.3d 873 (2009).

such conduct offends a public sense of justice and propriety; and (6) the defendant's net worth.[109] In our review of an exemplary damages award, we must state our reasons for upholding or disturbing the award, and we must "address the evidence or lack of evidence with specificity, as it relates to the liability for or amount of exemplary damages, in light of the requirements of" chapter 41.[110]

The evidence at trial did not show that Cummins had a negative net worth. After the judgment was rendered, Cummins filed an affidavit of indigency, and after a contest, the trial court found that she was indigent. But that finding, made after the trial court had rendered judgment and Cummins had filed her notice of appeal, was irrelevant to the trial court's earlier determination of the exemplary damages award. Furthermore, the other factors that a court considers in awarding exemplary damages weigh in favor of the award. As we have explained, Cummins posted a flood of statements about Lollar accusing her of all manner of serious wrongdoings, including crimes, and she published her statements to as wide of an audience as she could, including to numerous law enforcement agencies. The statements were designed to ruin Lollar's professional and personal reputation locally and nationally.

---

[109]Tex. Civ. Prac. & Rem. Code Ann. § 41.011(a) (West 2015).

[110]*Id.* § 41.013 (West 2015).

As to Cummins's argument that Lollar failed to show malice, we disagree. From our review of the record,[111] Lollar showed by clear and convincing evidence that Cummins acted with malice as that term is used in chapter 41 and with the actual malice required under the First Amendment. The evidence supports a conclusion that Cummins engaged in a persistent, calculated attack on Lollar with the intention to ruin both Lollar's life's work and her credibility and standing in the animal rehabilitation community. Cummins posted innumerable derogatory statements about Lollar impugning her honesty and her competency, and she repeatedly and relentlessly reported Lollar to multiple government agencies. The comments she made about Lollar leave no doubt that she had a specific intent to cause substantial injury or harm to Lollar.

Clear and convincing evidence also supports a finding that Cummins published statements on the internet with actual malice. For example, with regard to Cummins's statements about Lollar's dogs, the evidence supported a finding that Cummins was not telling the truth. The trial court's determination that Cummins was not credible was reasonable, and, consequently, we are required to ignore her testimony in reviewing the trial court's actual malice

---

[111] *See New York Times*, 376 U.S. at 285, 84 S. Ct. at 729 (considering the proof presented of actual malice and stating that the court "must 'make an independent examination of the whole record,' so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression") (citations omitted); *see also New Times, Inc.*, 146 S.W.3d at 165 ("a personal vendetta demonstrated by a history of false allegations may provide some evidence of malice, free-floating ill will does not").

determination. [112]    And if the trial court believed that Lollar, Kennedy, Dr. Messner, and Dr. Jarrett were telling the truth—and it is clear that the court did believe that—that determination was reasonable.  Their testimony supports the trial court's determination that Cummins published fabricated statements about Lollar's care of her dogs, and, thus, that the statements were made with actual malice.

Regarding the episiotomy video, Cummins offered only her own testimony to support her version.  Lollar, Dr. Jarrett, and Dr. Messner all agreed that what Cummins said occurred did not happen.  Cummins admitted that she had never performed an episiotomy on a bat before, and therefore she had no basis for asserting as fact what was at best speculation and at worst total fabrication.  But she posted her version as fact, not speculation, and then she spread her version as far and wide as she possibly could.

The evidence further supports a conclusion that Cummins told as many people as she could that Lollar was illegally obtaining and administering Isoflurane and rabies vaccines and that she made these representations as facts, despite the fact that they were based only on assumptions she had made based on limited information.  As with Cummins's statements about Lollar's dogs, the trial court's determination that Cummins was not credible was a reasonable one, and therefore we are required to ignore her testimony in our review.  And the trial

---

[112] *See Bentley,* 94 S.W.3d at 597–99.

63

court's determination that Lollar, Dr. Jarrett, and Dr. Messner were credible was a reasonable one. Based on these credibility determinations, clear and convincing evidence supports the trial court's finding that Cummins made statements on these matters with actual malice. We hold that the record supports a finding of malice—both of the malice required for an award of exemplary damages under Texas law and of actual malice as required for an award of exemplary damages in defamation actions.[113]

And finally under this issue, Cummins argues that the exemplary damages award was excessive. She includes no argument about why the damages were excessive other than to say that exemplary damages must be reasonably proportional to actual damages. She does not include any argument or citations to authority about why the damages were not proportional in this case.[114] Further, she did not timely raise this complaint in the trial court.[115]

And although the civil practice and remedies code's cap on exemplary damages[116] applied to this case, Cummins neither timely raised this issue in the

---

[113] *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7).

[114] *See* Tex. R. App. P. 38.1(i).

[115] *See Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427, 436 (Tex. 2005) (stating that proportionality requirements for exemplary damage awards are based on the constitution); *In re D.T.M.*, 932 S.W.2d 647, 652 (Tex. App.— Fort Worth 1996, no writ) ("Even constitutional arguments are waived at the appellate level if issues were not before the trial court.").

[116] *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b) (West 2015).

64

trial court nor argued on appeal that the trial court did not apply the cap or did not apply it correctly. This court has held that the statutory cap is an affirmative defense that must be pled and proved.[117] An argument that the trial court failed to properly apply the cap is therefore not a complaint about the sufficiency of the evidence to support the award.[118] Because Cummins neither preserved any complaint about the cap in the trial court nor raised the issue on appeal, we may not consider whether the trial court failed to properly apply the cap. We overrule Cummins's fifth issue as to the exemplary damages award.

Cummins included one other argument relating to the part of the relief awarded to Lollar on her defamation claim. In one sentence in the summary of her argument, Cummins challenges the permanent injunction included in the judgment. She argues, with no citation to authority,[119] that "[t]he court's order is also overly broad. It contains prior restraint[,] which is unconstitutional."

---

[117] *See Davis v. White*, No. 02-13-00191-CV, 2014 WL 7387045, at *10 (Tex. App.—Fort Worth Dec. 29, 2014, no pet. h.) (mem. op.) (holding that the statutory cap on exemplary damages is an affirmative defense that must be pled and proved at trial).

[118] *See Norra v. Harris Cnty.*, No. 14-05-01211-CV, 2008 WL 564061, at *2–3 (Tex. App.—Houston [14th Dist.] Mar. 4, 2008, no pet.) (mem. op.) (holding that a complaint on appeal from a bench trial that raises a new legal basis or theory for challenging a damages award that is not a complaint about the sufficiency of the evidence must be raised in the trial court to preserve the complaint for appeal).

[119] *See* Tex. R. App. P. 38.1(i).

The judgment ordered that "Cummins be permanently enjoined" and "ORDERED to immediately and permanently remove from the internet" statements that appeared on specified web pages. To the extent that the trial court's order required Cummins to remove the statements that the court ruled were defamatory, the order is constitutional.[120] But the order is unconstitutional to the extent that it permanently enjoins Cummins from making similar statements in the future.[121] Though Cummins can be held responsible for any defamatory statements she may make about Lollar in the future, the trial court could not issue an order prohibiting her from making them. Thus, to the extent that the order may be read to permanently enjoin Cummins from making similar statements in the future, we sustain Cummins's challenge to that part of the judgment.[122] We overrule the remainder of her fifth issue.

## B. Breach of Contract

Cummins's last five issues challenge the judgment for BWS for breach of contract:

> 6. Did Appellees present "more than a scintilla" of evidence that any of Appellant's actions meet *all four* of the following criteria for breach of contract?

---

[120] *See Kinney*, 443 S.W.3d at 93–94.

[121] *See id.*

[122] *But see* Tex. Const. art. I, § 8 (stating that "[e]very person shall be at liberty to speak, write or publish his opinions on any subject, *being responsible for the abuse of that privilege*" (emphasis added)).

66

a. The existence of a valid contract;

b. Performance or tendered performance by the plaintiff;

c. Breach of the contract by the defendant; and

d. Damages sustained by the plaintiffs as a result of the breach.

7. Did the trial court err in granting Appellee's [judgment] against Appellant for breach of contract?

8. Were Plaintiffs entitled to attorneys' fees?

9. Were attorneys' fees reasonable?

10. Were Plaintiffs entitled to liquidated damages? Were they reasonable, legal?

Cummins argues that the award of damages on the breach of contract claim was erroneous as to both Lollar and BWS, but the contract was with BWS and not with Lollar, and the trial court found that Cummins should pay only BWS $10,000 for breach of contract. And only BWS sought and was awarded damages for breach of contract. We therefore overrule as moot Cummins's issues challenging the breach of contract claim as to Lollar.

## 1. Sufficiency of the Evidence to Show Breach of Contract

In her sixth issue, Cummins argues that BWS did not present legally sufficient evidence to support the breach of contract claim. To prove a breach of contract claim, a plaintiff must show "the existence of a valid contract, performance or tendered performance by the plaintiff, breach of the contract by

the defendant, and damages sustained as a result of the breach."[123]  Cummins

argues that BWS produced no evidence that she breached the contract and

showed no proof of actual or financial damages.

In its petition, BWS alleged that Cummins breached a provision in the

intern contract that stated, "It is understood that the *data, techniques, results, and*

*anecdotal information provided* to Trainee during their internship at BWS is

proprietary and is copyrighted as intellectual property by BWS.  Trainee agrees

not to distribute, share, publish, or sell *this* information without obtaining prior

written permission from BWS."  [Emphasis added.]  BWS alleged that Cummins

breached these provisions in that:

> While [Cummins] was on the Bat World Sanctuary's premises she videotaped and photographed Bat World's techniques, results, data[,] and anecdotal information, often without the knowledge of Bat World Sanctuary.  After leaving the program [Cummins] began posting these videotapes and photographs on the internet without Bat World Sanctuary's permission, thereby breaching her contract with Bat World Sanctuary.  [Cummins] refuses to remove these videotapes and photographs from the internet where they remain as of the date of the filing of this suit.
>
> . . . .
>
> [Cummins]'s conduct as described above constitutes breach of contract for which [BWS] bring[s] this suit.  The breach of contract was a producing cause of actual damages to [BWS].

Lollar testified that she believed the contract prohibited Cummins from

sharing without permission any photographs or videos taken at BWS, regardless

---

[123]*City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 739 (Tex. App.—Fort Worth 2008, pet. dism'd).

of whether the photographs disclosed data, techniques, results, or anecdotal information provided to the intern. Much of Lollar's testimony at trial about Cummins's publishing of photos and videos related to whether Cummins had permission to publish them and not on whether they included information covered by the contract.

By its language, however, the provision applies only to data, techniques, results, and anecdotal information given to intern trainees. It does not prohibit a trainee from publishing photographs or videos that the trainee took at BWS if those pictures or videos do not fall within the categories protected by the contract.[124] As acknowledged by Lollar in her testimony, not all of the pictures taken and posted by Cummins contained proprietary or copyrighted information.

BWS introduced into evidence various photographs and four videos that Cummins took during her time at BWS and later posted online. The first video was of an old Pallid bat. Lollar did not explain what data, techniques, results, or anecdotal information this video disclosed, and in our review of the video, we could not determine that any such information was included in it. No one else testified for BWS on that point. Accordingly, there was no evidence that Cummins's publishing of the video was a breach of the contract.

---

[124] See Verhoev v. Progressive Cnty. Mut. Ins. Co., 300 S.W.3d 803, 816 (Tex. App.—Fort Worth 2009, no pet.) (stating that the plain language of a contract must be given effect when the parties' intent can be discerned from that language).

The second video was of orphan red bats hanging from a bat hut.  Lollar testified that the bat hut was a BWS design, but she did not elaborate on whether the design was proprietary or in what way the video disclosed protected data, techniques, results, or anecdotal information.  In our review of the video, we could not determine what information protected by the contract was included in it.  Thus, BWS did not produce sufficient evidence that this video's publication by Cummins violated the contract.

The third video was the episiotomy video.  When the video was played at trial, it was played without sound.  Lollar's attorney attempted to play the video again later to include the sound, but he and Lollar talked over the beginning of the video, and almost immediately after they stopped talking, the DVD player quit working.

The copy of the video included with the appellate record does contain sound, but even with the sound, we cannot say that the video discloses information protected by the contract.  The video was edited so that only a portion of the procedure was shown.  Of the parts that were shown, at times, nothing but Lollar's hand can be seen due to the angle of the camera and the small size of the bat.  Lollar explained very little of what she was doing in the procedure.  A person watching the video could glean only a hint of Lollar's technique for performing episiotomies.  From the combination of an incomplete video, misleading captions, an obscured view of the bat, and a lack of narration of what was happening, the evidence was not sufficient to show that this video

70

disclosed data, techniques, results, or anecdotal information protected by the contract.

The fourth video was of an orphan red bat being held by Cummins. There was no testimony about what protected data, techniques, results, or anecdotal information, if any, was disclosed in the video, and we could discern none from our viewing of it. Accordingly, BWS produced no legally sufficient evidence of how the publication of this video breached the contract.

As for the photographs that were published, there was no testimony about what data, techniques, results, or anecdotal information, if any, was disclosed in their publication. Many of the pictures appear to be just pictures of bats, and some are of Lollar's dogs. From our review of the photographs produced by BWS at trial, we cannot determine what protected information, if any, was included in them.

Cummins produced evidence in the form of an email exchange that for some of the photographs she published on Facebook, she informed Lollar almost as soon as she had published them, and Lollar replied, "Thank you Mary!!" When Cummins asked at trial if Lollar had ever asked her to remove anything that Cummins had published, Lollar stated, "I have never sent any communication to you whatsoever after you left our internship." Lollar produced no evidence refuting Cummins's evidence that she had assented to the publishing of some of the photographs on Facebook. Cummins thus produced uncontroverted evidence that Lollar assented to the publication of those

71

photographs and did not revoke her assent to the publication of those photographs before filing suit.

Regardless of whether Cummins's publication of videos and photographs taken at BWS may have violated some other right of BWS, the evidence at trial was not legally sufficient to show a breach of the contract's prohibition of the disclosure of data, techniques, results, and anecdotal information Cummins learned while at BWS.

The only other provision that BWS arguably alleged that Cummins breached was a provision that, if breached, provided for liquidated damages. In closing arguments, Lollar and BWS's attorney stated, "Your Honor, we request that [BWS] be awarded $10,000 in liquidated damages pursuant to the contract that was signed by Ms. Cummins." That part of the contract provided,

> *In the event that Trainee at any time fails to follow*, to the satisfaction of BWS, each and every *BWS guideline and procedure when caring for, treating, or housing bats*, then Trainee's Certificate of Completion of Bat World's training program shall be automatically revoked without notice or hearing and Trainee may no longer publish, advertise, or communicate to any person the fact that he or she was trained by BWS or was certified by BWS. BWS shall have sole discretion to determine whether or not the Certificate of Completion should be revoked. *In the event that* Trainee is notified in writing that Trainee's Certificate of Completion has been revoked by BWS *and* Trainee thereafter publishes, advertises or communicates to any person the fact that Trainee was trained by BWS or was certified by BWS, *then* Trainee agrees to pay BWS liquidated damages in the amount of $10,000, and all attorney's fees incurred by BWS in enforcing this contract. [Emphasis added.]

There is no evidence that BWS issued Cummins a certificate of completion that it subsequently revoked in writing and that Cummins then published, advertised, or

72

communicated the fact that she was trained or certified by BWS. Accordingly, no evidence supports a finding that Cummins breached this provision.

Furthermore, BWS did not produce sufficient evidence of damages. At trial, Lollar and her attorney had this exchange on the subject of damages:

> Q. [I]f somebody was to take photographs of Bat World and then publish them without your permission, would there be any way for you to put an exact dollar value on the photographs that they published without your permission?
>
> A. [I] could only base it on—on some of the information that . . . might be shared would be valuable. We—I've been hired as a consultant . . . in different capacities, and—and if my knowledge is freely shared along those lines, then . . . it would decrease the amount of value that my consultation would have.
>
> Q. How much have you charged in the past for consultation?
>
> A. $15,000.
>
> Q. Okay. And is $10,000 your estimate of the approximate amount that you would charge someone to randomly show these videos or pictures?
>
> A. Yes. Yes.
>
> Q. So, in your mind, the $10,000 has some bearing to the actual damages that you would suffer if photographs were published randomly without your approval?
>
> A. Yes.

Thus, Lollar's estimate of damages to BWS was based on the extent that the pictures or videos disclosed information for which she might otherwise be hired to provide in paid consultations. Assuming that Lollar was testifying about what she charges for consultations on behalf of BWS, her testimony was that she has been hired as a consultant "in different capacities," but she did not explain

73

how the videos or photographs disclosed information for which she provides consulting services. The only video that seems to arguably disclose information that might be covered by the contract was the video of the episiotomy. Thus, the evidence did not support a finding that Cummins's publication of the other videos and the photographs caused Lollar to suffer damages. And even assuming the record supported a finding that Lollar offers consultations on episiotomies, we have already held that the video in the record did not disclose proprietary information, and thus BWS did not prove that Cummins's publication of it caused damages arising from a breach of the contract.

The evidence provided by BWS to support damages is not sufficient to show that it suffered $10,000 in damages from a breach by Cummins of the intern contract. We sustain Cummins's sixth issue.

Cummins's seventh issue asks whether the trial court erred by granting Lollar and BWS judgment against her for breach of contract. Cummins does not include any new arguments under this issue, and we therefore need not address it.[125]

## 2. Attorney's Fees for Breach of Contract

Cummins's eighth and ninth issues challenge whether BWS was entitled to attorney's fees, and if it was, whether the fees awarded were reasonable. She

---

[125] *See* Tex. R. App. P. 38.1(i); *Gray v. Nash*, 259 S.W.3d 286, 294 (Tex. App.—Fort Worth 2008, pet. denied) (determining that issues were waived because of inadequate briefing).

74

argues that attorney's fees should not have been awarded because there was no breach of contract. BWS's petition requested an award of attorney's fees under section 38.001 of the civil practice and remedies code.[126] BWS did not plead any other basis for attorney's fees. Because we have held that the judgment for breach of contract was improper, we must also hold that the award of attorney's fees based on the contract was improper.[127]

### 3. Liquidated Damages

Cummins's tenth and final issue challenges the trial court's award of liquidated damages for breach of contract. We have already held that the evidence was insufficient to show that Cummins breached the contract provision triggering liquidated damages and that the trial court therefore should not have awarded liquidated damages to BWS. Accordingly, we need not address Cummins's tenth issue.

### IV. Conclusion

We affirm the trial court's judgment in part and reverse it in part. Having overruled Cummins's first, second, third, fourth, and seventh issues, and having overruled her fifth issue in part, we affirm the trial court's judgment as to the award of actual damages and exemplary damages for Lollar. We also affirm that

---

[126]Tex. Civ. Prac. & Rem Code Ann. § 38.001 (West 2015).

[127]*See MBM Fin. Corp.*, 292 S.W.3d at 666 (holding that because the court rendered a take-nothing judgment on the plaintiff's breach of contract claim, the party could not recover attorney's fees based on a breach of contract claim under civil practice and remedies code chapter 38).

portion of the trial court's judgment ordering Cummins to remove from the internet the web pages and defamatory statements specified in the judgment. Having sustained her fifth issue in part, we reverse that part of the trial court's judgment permanently enjoining Cummins from making similar statements in the future.

Having sustained Cummins's sixth, eighth, and ninth issues, we reverse that portion of the trial court's judgment awarding damages to BWS for breach of contract and attorney's fees and render judgment that BWS take nothing on its claims.

PER CURIAM

PANEL:  DAUPHINOT, MEIER, and GABRIEL, JJ.

MEIER, J., concurs without opinion.

DELIVERED:  April 9, 2015